UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GENARO RUIZ,                                :
                    Plaintiff,              :
                                            :
        v.                                  :          C.A. No. 16-507WES
                                            :
STATE OF RHODE ISLAND, *et al.*,            :
                    Defendants.             :

**MEMORANDUM AND ORDER**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

At a Court-annexed mediation held on April 29, 2019, Plaintiff Genaro Ruiz and all

Defendants, including the State of Rhode Island ("State") and others,[1] entered into what all

parties concur is a binding agreement to settle this case arising under 42 U.S.C. § 1983

("Settlement Agreement").  Based on a 2013 incident, the complaint alleged excessive force

during arrest and wrongful detention resulting in serious injuries requiring medical treatment in a

hospital after Plaintiff unwittingly picked up a heroin-filled package left on the porch of his

three-unit apartment building by law enforcement in connection with what Plaintiff claims was a

poorly planned controlled delivery.  During the mediation, all Defendants denied liability but

bargained for complete closure of the case, while Plaintiff sought payment of a sum of money as

compensation.  The resulting Settlement Agreement is consistent with these purposes; it is

reflected in a Release of All Claims ("Release") that Plaintiff executed on June 7, 2019, reciting

that, in consideration for $55,000 (the "Settlement Proceeds") for his "loss and damages," all

---

[1] Named as Defendants are the State and several State police officers.  Also named are two municipalities and
several local police officers.  However, it was the State that agreed to pay the Settlement Proceeds and it is the State
Defendants who have taken the lead in connection with the post-settlement effort to get the settlement
consummated, including in defending and prosecuting the pending motions.  The Municipal Defendants are covered
by the Release; they monitored these proceedings but have not actively participated in litigating the pending
motions.  "Defendants" refers only to the State and the three State police officers involved with the pending
motions; "all Defendants" refers to both the State Defendants and the Municipal Defendants.

claims against all Defendants would be fully and finally released forever and the case would be dismissed with prejudice.  Ex. A, ECF No. 100-1.[2]

In the Release, Plaintiff acknowledged that, to the extent that he was a Medicare beneficiary, it was his responsibility to resolve any Medicare claim.  However, during the negotiations, the parties did not discuss how Defendants would obtain closure with respect to any possible Medicare claim or lien.  In particular, during the mediation, Plaintiff never advised Defendants that he would refuse to supply his social security number ("SSN"), or any part of it, to facilitate implementation of the Settlement Agreement by allowing the State to ascertain whether Plaintiff was a Medicare beneficiary or to comply with the federal reporting requirement imposed by 42 U.S.C. § 1395y(b)(8)(A-B).  Similarly, during the mediation, Defendants never advised Plaintiff that the submission of his SSN, or any part of it, for the purpose of compliance with the Medicare statutory reporting requirement, was a precondition to paying the Settlement Proceeds.  During the post-settlement period, as the parties worked to implement the Settlement Agreement, Defendants consistently requested the specified information needed to comply with 42 U.S.C. § 1395y(b)(8)(A-B), including Plaintiff's SSN, and Plaintiff omitted it from what he provided, while remaining silent regarding his intent to refuse to provide it.  After Plaintiff finally clearly articulated his position that he would never supply his SSN, or any part of it, the State refused to pay the Settlement Proceeds and the parties turned to the Court for assistance in getting the Settlement Agreement consummated.

Now pending before me for determination pursuant to 28 U.S.C. § 636(b)(1)(A) are the parties' dueling motions seeking resolution of this dispute.  Advanced Voice Commc'ns, Inc. v. Gain, No. C.A. 09-56ML, 2010 WL 677459, at *1 (D.R.I. Feb. 25, 2010) (motion to enforce

---

[2] The exhibits attached to the submissions of Plaintiff and Defendants differ in their numbering/lettering, so I refer to each as they are designated by the submitting party, but also include the unique CM/ECF header citation.

settlement agreement appropriately referred to magistrate judge for determination).  Plaintiff

moved to enforce the Settlement Agreement[3] and for an award of attorneys' fees, punitive

damages and interest.  ECF No. 100.  Defendants have moved to compel Plaintiff to comply with

what they interpreted as a consented-to Order of the Court requiring Plaintiff either to provide

his SSN or to provide an affidavit averring that he does not have an SSN.  ECF No. 102.

Following extensive proceedings, including two hearings, both motions are now ripe.  For the

reasons that follow, Plaintiff's motion is granted in part and denied in part, while Defendants'

motion is denied as moot.

I.      BACKGROUND – LAW AND FACTS

        A.      Plaintiff's Background

        Plaintiff is an older individual who was approximately sixty years old[4] at the time of the

incident (in 2013) that underpins his claim.  During his deposition, Plaintiff testified that the

arrest and incarceration caused him to develop a serious medical condition and resulted in a

week-long hospitalization.  See generally ECF No. 101-2; id. at 42-43.  Inconsistent with this

testimony, Plaintiff submitted a document from the Rhode Island Hospital reflecting that he has

incurred a total of only $2501.28 in hospital charges from 2013 through 2017, all which were

paid in full by "patient."  ECF No. 100-5.  As of the date of the incident, Plaintiff had been

employed; discovery materials related to his employment displayed the last four digits of an

---

[3] A motion to enforce an agreement to settle may be filed in the federal case as long as it is still pending in federal court.  Gain, 2010 WL 677459, at *3-4; see United States v. Hardage, 982 F.2d 1491, 1496 (10th Cir. 1993) ("A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it.").

[4] Plaintiff's age is described as "approximate" based on Defendants' representation that discovery materials reflect different dates of birth; Plaintiff does not dispute this representation.  Such inconsistencies also crop up in Plaintiff's own representations to the Court about his age.  For example, on July 26, 2019, Plaintiff advised the Court that he was sixty-one years old at the date of the "accident," ECF No. 100-4 at 2, while on November 6, 2019, he represented that he was "sixty (60) years old at the time of the incident."  ECF No. 100 at 6.

SSN.  ECF No. 101-2 at 48-49.  According to a declaration Plaintiff signed on August 16, 2016

(long after the Settlement Agreement was finalized and the parties were sparring about whether

he would provide his SSN), Plaintiff averred: "I have never been enrolled in nor applied for

Medicare, Medicaid, or any government health insurance program. . . .  I paid the total amount

due myself."  ECF No. 100-6 ¶¶ 11, 13.  This declaration further states, "I did not agree to

provide a[n SSN] as a term of the settlement of this case. . . .  I will not provide a[n SSN] as a

term of the settlement of this case."  Id. ¶¶ 14-15.  Very recently, Plaintiff's counsel informed

Defendants that he will not disclose "a[n SSN], the last five digits, or any digits of such number."

ECF No. 115-1 at 3.

### B.     Federal Law Imposing Medicare Reporting Requirements

Enacted in 1965, Medicare is a federally funded and administered health insurance

program for certain groups, primarily elderly (age sixty-five and older) and disabled persons.

Health Insurance of the Aged Act, Title I of Social Security Amendments of 1965, Pub. L. No.

89-97, 79 Stat. 286 (July 30, 1965).  The Department of Health and Human Services ("HHS")

administers Medicare through the Centers for Medicare and Medicaid Services ("CMS").  In re

Plavix Mktg., Sales Practices & Prod. Liab. Litig., 123 F. Supp. 3d 584, 602 (D.N.J. 2015).

Since 2007,[5] pursuant to the Medicare, Medicaid and SCHIP Extension Act,

("MMSEA"), specifically 42 U.S.C. § 1395y(b)(8)(A-B), any self-insured entity[6] paying a

liability settlement must submit "information as [HHS] shall specify," § 1395y(b)(8)(B)(ii)

---

[5] The MMSEA reporting requirements were adopted to add teeth to a concept embedded in the law since 1980 – that Medicare is the secondary payor and must be reimbursed if any other payment source is available.  See Medicare Program: Medicare Secondary Payer and Certain Civil Money Penalties, 85 Fed. Reg. 8793-02, 2020 WL 764618, at *8794-8800 (proposed Feb. 18, 2020) (to be codified at 42 C.F.R. pt. 402).

[6] The MMSEA reporting requirements apply to a complex array of entities designated by a potpourri of confusing acronyms (e.g., RRE, NGHP).  Which acronym is applicable shifts depending on what category of person or entity is in issue.  For MMSEA purposes, the category in issue in this case is the State functioning as a "self-insured entity."  To avoid using confusing acronyms, this memorandum and order uses the term "self-insured entity."

("specified information"), regarding the beneficiary of the settlement or judgment into a CMS portal to determine the Medicare status of the injured party. In re Asbestos Prod. Liab. Litig., Civil Action No. 12-cv-60048, 2013 WL 2367790, at *3 (E.D. Pa. May 30, 2013); see Seger v. Tank Connection, LLC, No. 8:08CV75, 2010 WL 1665253, at *4 n.3 (D. Neb. Apr. 22, 2010) (MMSEA "requir[es] . . . self-insurers to provide[] detailed information regarding all liability settlements" by submitting query). In holding that the reporting requirement applies to all settlements, not just to those with known Medicare beneficiaries, these cases emphasize that a purpose of the § 1395y(b)(8)(A)(i) query requirement is to protect the self-insured entity that would otherwise be at the mercy of a claimant's untested averment that he was not a Medicare beneficiary. See Bey v. City of New York, No. CV 2011-5833(BMC)(MDG), 2013 WL 439090, at *1-2 (E.D.N.Y. Feb. 5, 2013) (collection of SSN is a "'required, legitimate and necessary use of the SSN under federal law,' . . . even where a plaintiff has a reasonable argument that he would not qualify for such benefits"); Hackey v. Garofano, No. CV095031940S, 2010 WL 3025597, at *4 (Conn. Super. Ct. July 1, 2010) (appropriate for insurer to ask for SSN of sixteen-year-old plaintiff and his uninjured father to comply with § 1395y(b)(8)). The failure to make such a query within a specified time period potentially exposes the entity paying the settlement or judgment to a fine of $1000 per day, as well as, by offset or by direct collection, up to double any amounts paid by Medicare on behalf of the injured party. 42 U.S.C. § 1395y(b)(8)(E)(i); 42 C.F.R. § 411.24(c). Such reimbursement to Medicare must be made even though the self-insured entity has already paid the settlement proceeds to the beneficiary. 42 C.F.R. § 411.24(i).

Until 2013, the specified information required by CMS to make this query, as mandated by MMSEA, unambiguously included the injured party's full SSN. In re Asbestos Prod. Liab. Litig., 2013 WL 2367790, at *3 ("query must contain the injured party's [SSN]") (quoting CMS

User Guide); <u>Bey</u>, 2013 WL 439090, at *1 ("Disclosure of a plaintiff's information such as an SSN . . . is 'necessary for the defendant to comply with its statutory duty to report.'"); <u>Seger</u>, 2010 WL 1665253, at *4 n.3 ("[SSN] is essential to the administration of the Medicare program. Collection of the SSNs for the purpose of coordinating benefits with Medicare is a required, legitimate and necessary use of the SSN under federal law."); <u>Hackley</u>, 2010 WL 3025597, *4 (Medicare "reporting requirements affect *all* parties involved in a payment of a settlement"; therefore, it is permissible for insurer to condition disbursement of settlement fund on SSN from claimant) (emphasis in original). However, in 2013, Congress amended § 1395y(b)(8)(B)(ii) with the passage of § 204 of the SMART Act, Public Law 112-242, H.R. 1845, (112th Cong. Jan. 10, 2013) ("SMART Act"). In pertinent part, § 204 provides:

> Not later than 18 months after January 10, 2013, the Secretary shall modify the reporting requirements under this paragraph so that an applicable plan in complying with such requirements is permitted but not required to access or report to the Secretary beneficiary social security account numbers or health identification claim numbers, except that the deadline for such modification shall be extended by one or more periods (specified by the Secretary) of up to 1 year each if the Secretary notifies the committees of jurisdiction of the House of Representatives and of the Senate that the prior deadline for such modification, without such extension, threatens patient privacy or the integrity of the secondary payer program under this subsection. Any such deadline extension notice shall include information on the progress being made in implementing such modification and the anticipated implementation date for such modification.

<u>Id.</u> <u>codified at</u> 42 U.S.C. § 1395y(b)(8)(B)(ii). Importantly, while the SMART Act directed HHS to modify its requirements to permit MMSEA compliance without requiring "social security account numbers" to be reported, it did not alter § 1395y(b)(8)(A)(i-ii), which requires that any self-insured entity paying a liability settlement <u>must</u> submit specified information to determine the Medicare status of the injured party or risk payment of a fine. In recognition that it may be difficult, sometimes impossible, for insurers to obtain the specified information, § 203 of the SMART Act adjusted the fine for non-compliance by self-insured entities from a mandatory fine

6

to one that "may be" imposed; it required HHS to adopt rules creating a safe harbor for any self-insured entity that has made "good faith efforts to identify a beneficiary" but has been unable to procure the specified information.  SMART Act § 203.

Since 2013, HHS has struggled to comply with the SMART Act.  In December 2013, it published an advanced notice of proposed rulemaking, but no rules followed.  In Senate and House letters to HHS signed in July 2014, members of Congress complained about the lack of progress.[7]  The Congressional Letters make clear that § 204 of the SMART Act was designed to safeguard Medicare "beneficiaries and the regulated community [by] eliminat[ing the use] of <u>full</u> SSNs in the reporting process," while § 203 was adopted to create a safe harbor to protect entities unable to comply with the mandatory requirement despite a good faith effort.[8]  Senate Letter at 2 (emphasis supplied); House Letter at 2 (emphasis supplied).

After the statutory deadline, in September and November 2014, CMS published two "Alerts" implementing § 204 of the SMART Act.  ECF No. 100-7 ("Ex. G"), 100-8 ("Ex. H")

---

[7] The letter from the Senate may be accessed at http://www.marccoalition.com/uploads/8/4/2/1/8421729/140714-final-msp-letter-to-cms.pdf.  The letter from the House may be accessed at http://www.marccoalition.com/uploads/8/4/2/1/8421729/2014-house-letter-to-cms-marilyn-tavenner-july-2014.pdf.  These letters are referred to as "Senate Letter" and "House Letter," respectively.

[8] Plaintiff represented to the Court that the legislative history of the SMART Act establishes that it imposed a total ban on the use of the SSN to comply with the MMSEA reporting requirement; however, he did not cite to any legislative history.  The Court's review of the legislative history reveals nothing to suggest that Congress was seeking to bar self-insured entities from requiring a claimant to provide the SSN for reporting purposes.  Rather, it was concerned about CMS protecting seniors from fraud and identity theft but was deliberately vague about how CMS would implement a solution.  For example, commenting on Senate Bill 1718, the Senate version of what became the SMART Act (which expressly refers to disclosure of a partial SSN), Senator Wyden noted in a floor statement on October 17, 2011, that the proposal "is in line with a recently launched Medicare campaign which encourages beneficiaries not to give out these numbers as an important tool in fighting health care fraud and identity theft."  157 Cong. Rec. S6602-01, S6602, 2011 WL 4916265 (Oct. 17, 2011) (Statement of Sen. Ron Wyden).  He added, "[w]e should not be sending seniors mixed messages or punishing businesses that are unable to obtain this information, despite their best efforts, from understandably reticent seniors."  <u>Id.</u>  Senator Portman also commented on the version of the bill expressly mandating partial SSN disclosure and emphasized privacy concerns, stating, "[t]his legislation directs Medicare to establish an alternative method of identifying individuals, to mitigate concerns about identity theft and Medicare fraud."  157 Cong. Rec. S6602-01, S6604, 2011 WL 4916265 (Oct. 17, 2011) (Statement of Sen. Rob Portman).  The post-passage letters that Congress sent to HHS (<u>see</u> n.7, <i>supra</i>) confirm that the purpose of the SMART Act as ultimately enacted was to permit compliance with Medicare reporting requirements by self-insured entities (among others) with less than the full SSN.

("2014 CMS Alerts").  The September 10, 2014, CMS Alert announced the modification of the

reporting requirement to mandate that the required query must include at least the last five digits

of the SSN.  Ex. H.  In a consistent manner, the November 25, 2014, CMS Alert states:

"[e]ffective January 5, 2015, where a [self-insured entity] cannot obtain an individual's . . . full

SSN, the [self-insured entity] may report the last 5 digits of the individual's SSN."[9]  Ex. G at 2.

The September 10, 2014, Alert specifies, "CMS highly recommends, but does not require, that

[self-insured entities] submit the . . . full SSN as part of their reports, as it significantly increases

CMS' ability to accurately identify an individual as a Medicare beneficiary."  Ex. H at 2.

However, with regard to the safe harbor called for by § 203 of the SMART Act (which was

required to be adopted by rule), the 2014 CMS Alerts provided self-insured entities no comfort.

The November 25, 2014, Alert vaguely states: "[i]f a[ self-insured entity] is unable to obtain the .

. . full/partial SSN, they must document their attempts to obtain this information."  Ex. G at 2.

The Alert mentions and provides a link to a form, "to reflect a[ self-insured entity's] attempt to

obtain the partial SSN."  Id.; Ex. B, ECF No. 108-2 ("Medicare Reporting Form").[10]  Neither of

these imprecise provisions amounts to the safe harbor promised by § 203 of the SMART Act.

 More than five years passed before HHS took further steps towards implementing § 203

of the SMART Act.  Very recently, on February 18, 2020, HHS finally published the long-

awaited proposed rule.  As proposed, the safe harbor provision provides:

---

[9] Pursuant to Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865 (1984), HHS's
interpretation that § 204 of the SMART Act permitted implementation by reducing the reporting requirement from
requiring the full SSN to requiring the last five digits of the SSN is entitled to judicial deference.

[10] Plaintiff argued that this Medicare Reporting Form confirms that, post-SMART Act, CMS no longer required any
part of the SSN for MMSEA reporting.  The argument is belied by the language of the 2014 CMS Alerts.  It also is
contradicted by the Form itself, which states that the refusal to provide the SSN, or at least the last five digits, "may
be violating obligations as a beneficiary to assist Medicare in coordinating benefits."  Ex. B, ECF No. 108-2 at 3. In
any event, Plaintiff never filled in the Medicare Reporting Form linked to the 2014 CMS Alerts and his counsel
represented that he would refuse because it asked either the SSN or a reason "for Refusal to Provide Requested
Information."  Id.

If an [self-insured] entity fails to report required information because the [self-insured] entity was unable to obtain information necessary for reporting from the reportable individual, including an individual's last name, first name, date of birth, gender, . . . SSN (or the last 5 digits of the SSN), and the responsible applicable plan has made and maintained records of its good faith effort to obtain this information by taking all of the following steps:

- The [self-insured entity] has communicated the need for this information to the individual and his or her attorney or other representative and requested the information from the individual and his or her attorney or other representative at least twice by mail and at least once by phone or other means of contact such as electronic mail in the absence of a response to the mailings.
- The [self-insured entity] certifies that it has not received a response in writing, or has received a response in writing that the individual will not provide his or her . . . SSN (or last 5 digits of his or her SSN).
- The [self-insured entity] has documented its records to reflect its efforts to obtain the . . . SSN (or the last 5 digits of the SSN) and the reason for the failure to collect this information.

The [self-insured entity] entity should maintain records of these good faith efforts (such as dates and types of communications with the individual) in order to be produced as mitigating evidence should CMS contemplate the imposition of a [penalty]. Such records must be maintained for a period of 5 years.

Medicare Program: Medicare Secondary Payer and Certain Civil Money Penalties, 85 Fed. Reg. 8793-02, 2020 WL 764618, at *8794-8800 (proposed Feb. 18, 2020) (to be codified at 42 C.F.R. pt. 402) ("Proposed Rule").

The Proposed Rule reiterates HHS's now long-standing interpretation of § 204 of the SMART Act as modifying the "information necessary for reporting from the reportable individual" from the full SSN to at least "the last 5 digits of the SSN." Id. at *8800. That is, the text of the Proposed Rule confirms that, post-SMART Act, when a self-insured entity settles any personal injury claim, it remains subject to a federal reporting requirement that mandates use preferably of the full SSN, but at least the last five digits of the SSN, to make the query to determine whether the claimant is a Medicare beneficiary. Id. A self-insured entity that can procure even five digits of the SSN has "fail[ed] to report required information." Id. However,

the Proposed Rule at least makes clear that such a failure to comply will not result in a fine, as long as the self-insured entity made "good faith effort[s]" sufficient to qualify for the safe harbor. Id.

As of this writing, the Proposed Rule remains pending; the public comment phase just ended on April 20, 2020.  Id. at *8794.

### C.     Rhode Island's Compliance with MMSEA Reporting Requirements

As the responsible party under the Settlement Agreement in this case, the State is a "self-insured" entity covered by MMSEA, subject to the federal reporting requirement in 42 U.S.C. § 1395y(b)(8)(A-B) and vulnerable to fines and other consequences if it fails to comply.  To comply with its MMSEA reporting obligation, the State has engaged a vendor to manage CMS exchanges.  In compliance with the 2014 CMS Alerts, the State's vendor typically uses the full SSN to submit a query to determine if an individual is entitled to Medicare benefits.  The State interprets federal law to require it to try to use the full SSN and, if the full SSN is not available, to submit the last five digits of the SSN.

To obtain the information needed for the State's vendor to query CMS as required by MMSEA, the State has developed a "Medicare Reporting Form for RI State Agencies," which asks for information pertaining to the individual, including the SSN.  Ex. 3, ECF No. 101-2 at 14-15 ("RI Medicare Reporting Form").  The RI Medicare Reporting Form is processed by the Rhode Island Department of Administration, which submits the information for periodic CMS query to the State's vendor.  Consistent with the strong language in the CMS Alerts about the preference for reporting with the full SSN, the RI Medicare Form simply asks the person completing the form to fill in the "Social Security Number."  Id.

### D.     The Mediation and Settlement Agreement

Throughout the course of this case, including during the court-annexed mediation held on April 29, 2019, Plaintiff was represented by sophisticated and highly experienced counsel, while Defendants were represented by the Office of the Attorney General.  Further, as of the time of the mediation, Plaintiff's counsel were aware of the criticality of the SSN to consummate a personal injury settlement with the State – in 2018, the same attorneys worked with the State on the settlement of a different case; as a prerequisite to the issuance of a check for that settlement, the State insisted on the completion by the claimant of a W-9 form because the claimant's SSN was essential.[11]  Exs. 16-17, ECF No. 101-2 at 66-72.  During the mediation, neither party raised or discussed whether Plaintiff's SSN, partial or full, would be required by Defendants as a condition precedent to issuance of the check for the Settlement Proceeds or whether Plaintiff would refuse to provide it.  Nevertheless, the parties agree that the mediation resulted in a final and binding Settlement Agreement, whereby Plaintiff would be paid the Settlement Proceeds and all Defendants, including the State, would obtain complete closure through final resolution of all issues arising from Plaintiff's 2013 arrest and incarceration.

### E.     Post-Mediation Efforts to Implement Settlement

After the parties reached the agreement in principle to settle the case on April 29, 2019, Defendants' counsel prepared and forwarded to Plaintiff's counsel the documents that the State would require to be completed or executed before issuing a check in the agreed amount.  First, Defendants required Plaintiff to sign the Release, which he did on June 7, 2019; in it, he acknowledged that, to the extent that he had received Medicare benefits, it was his responsibility to pay them.  Ex. A, ECF No. 100-1.  Second, Plaintiff's attorneys approved the electronically

---

[11] Plaintiff argues that the prior case was different in that the claimant was an admitted Medicare beneficiary.  This is a difference without distinction.  What matters is that Plaintiff's counsel had recently been made aware of the State's policy of not issuing a check to fund a settlement or judgment until it has complied with MMSEA, for which it needs an SSN.

signed stipulation of dismissal with prejudice and filled in the W-9 form for the law firm.  And third, on July 5, 2019, Plaintiff returned the RI Medicare Reporting Form, seemingly filled in, except that he marked "n/a" on the line where the SSN was called for.  Ex. 4, ECF No. 101-2 at 16-17.  Plaintiff did not inform Defendants that he was deliberately omitting his SSN and that he intended to refuse to supply it.

Without comment on the omission of the SSN, Defendants' counsel forwarded these documents, including the incomplete RI Medicare Reporting Form, to the Department of Administration for processing.[12]  On July 10, 2019, Defendants emailed a status report to the court-annexed mediator, with a copy to Plaintiff's counsel.  Ex. A, ECF No. 104-1.  As pertinent here, in the status report, Defendants specifically advised:

> Attorney Wyrzykowski also attached a blank Medicare Reporting Form for Plaintiff's counsel to complete.  The Medicare, Medicaid and SCHIP Extension Act of 2007 (42 U.S.C. 1395y(b)(7) and (8)) requires all insurers, including the State of Rhode Island, to report any liability settlement payments made to beneficiaries of all three programs to the federal government.  <u>The State requires this documentation before it can process any settlement check</u>.

Id. at 1 (emphasis supplied).  This report expressed the understanding of Defendants that the RI Medicare Reporting Form had been "complete[d]" and was ready for submission "for Medicare inquiry."  Id.  Plaintiff received the report but remained silent; importantly, he did not contradict Defendants' representation to the court-annexed mediator that, in connection with "completion of this procedure" flowing from the Settlement Agreement, the State needed the information required by the RI Medicare Reporting Form (which called for the SSN) to complete its mandatory MMSEA reporting, as well as that "[t]he State requires this documentation before it

---

[12] The record does not reveal why the incomplete form omitting the SSN was forwarded for processing; the Court could speculate that busy attorneys did not notice the omission, although they could have seen at a glance that Plaintiff filled in the line for the SSN by writing in "n/a."  What matters for present purposes is that I do not find that the State's failure to notice the omission of the SSN until it was later discovered at the Department of Administration amounts to a knowing waiver of any rights.

can process any settlement check."  Id.  Nor did he point out that he had actually not completed the RI Medicare Reporting Form in that he had deliberately withheld his SSN and that he intended to refuse to provide his SSN.

> ### F.    Plaintiff's Refusal to Provide SSN/Response of Defendants and Court

On July 15, 2019, the Rhode Island Department of Administration reported that Plaintiff's RI Medicare Reporting Form had been rejected because of the missing SSN; on the same day, this problem was communicated to Plaintiff.  Ex. 1, ECF No. 105-1.  In response, and as far as the record reflects, for the first time, Plaintiff advised Defendants that he had deliberately withheld his SSN.  Defendants promptly (on July 25, 2019) asked the Court to intervene and for instructions.  Ex. C, ECF No. 100-3.  Defendants' letter advised the Court that MMSEA requires the State to report the information specified by CMS, preferably using the full SSN and at a minimum the last five digits of the SSN.  Id.  Plaintiff's counsel responded to the lawyers representing Defendants, alleging that "CMS paid nothing" for Plaintiff's care and threatening that "[t]here will be a reckoning."  Ex. 6, ECF No. 102-2 at 22.  To the Court, Plaintiff represented that he was sixty-one years old at the time of the "accident," has never been disabled and "is not and never was a Medicare claimant"; he argued that, "[s]urely the State is not prepared to argue that anyone in the world who might have a cause of action against the State involving physical injury cannot expect to receive the payment of monetary damages without providing a social security number because they *may be* a Medicare beneficiary."  Ex. D, 100-4 at 2-3 (emphasis in original).

The Court promptly set up a conference call for August 15, 2019; prior to the call, the clerk asked the parties if the call needed to be on the record, in which event there might be a scheduling issue.  Ex. B, ECF No. 104-2.  Attorney Kurland responded for Plaintiff that a record

might be helpful but that she would defer to others.  Ex. 6, ECF No. 105-6.  When no other party

asked for a stenographer, the conference was convened without a record.  Attorney Kurland

joined the call for Plaintiff; Attorney Sinapi tried to join for Plaintiff but, as the Court later

learned, he was disconnected.

During the call with the Court, Attorney Kurland did not tell the Court that she was not

competent to represent Plaintiff; did not ask the Court to reschedule the call to allow Attorney

Sinapi to participate; did not advise the Court that Plaintiff's position was that the Settlement

Agreement, interpreted in light of applicable law, barred Defendants from requiring Plaintiff's

SSN as a condition of issuing the Settlement Proceeds; and did not inform the Court that Plaintiff

would refuse to provide his SSN or any information about his SSN.  In reliance on Attorney

Kurland's statements to the Court, the Court understood that "the matter was resolved with the

assent of all counsel" that Plaintiff would either provide his SSN or an affidavit averring that he

did not have an SSN; the Court expected "the submission of the consented to order discussed."

Ex. 8, ECF No. 102-2.  When Attorney Sinapi demanded that the Court reconvene the call, the

Court declined and indicated that, if such an Order were not submitted, it would "entertain a

motion for Defendants to compel the same."  Ex. 7, ECF No. 102-2 at 25.

Instead of submitting an assented-to Order or providing either his SSN or an affidavit

saying that he did not have one, Plaintiff submitted the declaration asserting that he "did not

agree to provide a[n SSN]" and "will not provide a[n SSN] as a term of the settlement of this

case."  Ex. F, ECF No. 100-6 at 4.  When Defendants demanded compliance with what Plaintiff

had agreed to during the call with the Court, Plaintiff responded with his motion to enforce,

arguing for the first time that he has the absolute right to refuse to disclose his SSN pursuant to

the Privacy Act of 1974, 5 U.S.C. § 552(a)(1)[13] ("Privacy Act").  Defendants answered by filing

the motion to compel compliance with the Order they understood had been agreed to during the

August 15, 2019, call, as the Court had invited them to do.  With no assented-to Order, no record

to establish what Plaintiff had agreed to do and the invocation of a federal statute ostensibly

barring an Order to disclose the SSN without consent, the District Court referred both motions to

me for determination.

> ### G.   <u>Hearings on Pending Motions</u>

At the hearings on the pending motions, the parties were offered and declined an

evidentiary hearing because, as they agreed, no material facts are in dispute.  During the first

hearing, Plaintiff argued vehemently that the SMART Act wiped away any need for a claimant's

SSN or any part of the SSN so that self-insured entities need do nothing more than submit

whatever information may be culled from discovery but are barred from asking for the SSN as a

prerequisite to paying a settlement or judgment in a case involving personal injury.  In support,

Plaintiff submitted the SMART Act itself, the 2014 CMS Alerts and the Privacy Act, which

makes it unlawful for a "State . . . agency" to deny any "right, benefit, or privilege provided by

law because of such individual's refusal to disclose his [SSN]."  5 U.S.C. § 552a(a)(1).

For their part, Defendants confirmed that they had not made an actual attempt to query

CMS about Plaintiff.  With so many loose ends dangling, the Court continued the hearing.

Plaintiff was directed to provide support for his argument that the SMART Act must be

interpreted as eradicating any federal requirement that the State must query CMS using at least

part of the SSN, leaving the State in violation of the Privacy Act because it denied Plaintiff's

---

[13] The Privacy Act is not codified but may be found in the notes at 5 U.S.C. § 552a.

right[14] to the Settlement Proceeds until he disclosed his SSN.  Defendants were directed to attempt to query CMS using the information provided by Plaintiff in discovery, which included an employment record with the last four (not five) digits of an SSN; Plaintiff stated on the record that he had no objection to this personal information being used in this way.

When the second hearing was convened, three matters were discussed.  First, Plaintiff provided the Court with no authority, beyond the language of the SMART Act and the 2014 CMS Alerts, to support the proposition that the State was relieved by the SMART Act of the duty to report any part of the SSN; and Plaintiff confirmed that no court has adopted his interpretation of the SMART Act.  Second, Defendants advised the Court that, on February 18, 2020, HHS finally issued the Proposed Rule to create the safe harbor called for by § 203 of the SMART Act.  Proposed Rule, 2020 WL 764618, at *8795.  And third, the State reported on its efforts, at the Court's direction, to comply with MMSEA without Plaintiff's cooperation.  As it represented, beginning soon after the first hearing, State workers scoured the discovery materials.  Using every iteration of Plaintiff's date of birth and appending the digits 0 to 9 to the four SSN digits appearing in the employment record produced in discovery, they ran 110 queries, a process that took many hours.  The response to every query, returned by CMS several weeks later, was that Plaintiff was not a Medicare beneficiary.

After the hearing, again at the Court's direction, and mindful of the guidance finally afforded by the Proposed Rule regarding what is enough to establish "good faith efforts" so as to qualify for the to-be-established safe harbor, the State sent a letter to Plaintiff formally requesting in writing the last five digits of his SSN and Plaintiff responded by email that he was

---

[14] Beyond the scope of this memorandum and order is whether the State's contractual duty to pay the Settlement Proceeds amounts to a "right, benefit, or privilege provided by law," as contemplated by the Privacy Act.  Because, for the reasons stated *infra*, it is so clear that the Privacy Act is not applicable, the Court did not need to solve this conundrum.

refusing to provide "a[n SSN], the last five digits, or any digits of such number."  ECF No. 115-1 at 3.

## II.     STATE'S COMPLIANCE WITH MMSEA AND ENFORCEMENT OF SETTLEMENT AGREEMENT

Based on the State's extraordinary efforts to comply with its MMSEA reporting obligations, the Court finds that Plaintiff's intransigence in refusing to provide either his full SSN or the last five digits of his SSN is well established and that the State, as a self-insured entity subject to the mandatory federal reporting requirement, has both fully complied with the reporting requirement (by submitting queries based on every possible iteration of the five digit SSN built using information Plaintiff provided in discovery with Plaintiff's knowledge and consent that it was to be used for MMSEA reporting) and has made far more than adequate "good faith efforts to identify a beneficiary."  SMART Act § 203.  To be clear, the Court finds that the State has made significant (and successful) efforts to comply fully with the letter and spirit of MMSEA, and that it has complied in that it made the requisite query using at least a five-digit iteration of Plaintiff's SSN.  The Court further finds that the State's actions fit neatly into the not-yet-established safe harbor limned by the Proposed Rule, so that the penalties and sanctions for non-compliance, should that somehow be suggested, may not be imposed.  Finally, the Court finds that the State (and the Court) appropriately relied on Plaintiff's acquiescence to the use of the information he produced in discovery to make the required report to CMS.

Turning back to the Settlement Agreement, and based on these findings, I conclude that the Defendants' prerequisite to "process[ing the] settlement check," Ex. A, ECF No. 104-1 at 1, and paying Plaintiff the Settlement Proceeds has been accomplished, albeit at great and potentially inappropriate expense to the State and to CMS (which had to process 110 queries).  Accordingly, both Defendants' opposition to Plaintiff's motion to enforce and their own motion

to enforce are moot and Plaintiff's motion to enforce – solely with regard to consummation of the Settlement Agreement – may be and hereby is granted.  There is no further need for Plaintiff to disclose his SSN or any part of it as a prerequisite to receiving the Settlement Proceeds.

## III.   PUNITIVE DAMAGES, INTEREST AND ATTORNEYS' FEES

What remains in issue is Plaintiff's strident demand for punitive damages and interest pursuant to R.I. Gen. Laws § 9-1-50 based on what he claims was the State's willful and wanton disregard for his rights, as well as his demand for an award of the attorneys' fees caused by Defendants' conduct, as a sanction for what he labels as "***illegally harassing***," "**ABSOLUTELY FALSE**," "***false and frivolous***" and "***text book example of bad faith and oppression.***"  E.g., ECF No. 108 at 1, 7-8, 9 (emphasis in original).

### A.    **Plaintiff's Motion for Punitive Damages and Interest**

The Court need not linger over Plaintiff's invocation of R.I. Gen. Laws § 9-1-50, which creates a rebuttable presumption that the failure of an insurance company to pay a settlement within thirty days of the plaintiff's sending the release is "a willful and wanton disregard for the rights of the claimant," giving rise to a claim for punitive damages and interest at 12%.  Section 9-1-50 does not apply because the State is not an insurance company.  Further, as interpreted by the Rhode Island Supreme Court, once circumstances occasioning the delay are explained by the insurance company, the presumption is rebutted and the plaintiff must show conduct bordering on criminality to recover.  Maciszewski v. Flatley, 814 A.2d 342, 345 & n.3 (R.I. 2003).  The State's conduct in delaying payment of the Settlement Proceeds here does not conceivably amount to "willful and wanton disregard" for Plaintiff's rights bordering on criminality as defined in Maciszewski.  To the contrary, the State has acted in good faith for the purpose of complying with MMSEA consistent with long-standing State policy and in seeking compliance

with the assented-to Order to which the State, like the Court, understood Plaintiff had agreed.

Therefore, if R.I. Gen. Laws § 9-1-50 did apply, it would not result in an award of punitive

damages.  Plaintiff's motion for punitive damages and interest pursuant to R.I. Gen. Laws § 9-1-

50 is denied.

     **B.**    **Plaintiff's Motion for Attorneys' Fees**

Plaintiff argues that Defendants' refusal to deliver the Settlement Proceeds until he

supplied all or part of his SSN is a violation of the Privacy Act for which he is entitled to an

award of attorneys' fees.[15]  While the Privacy Act itself does not confer the right to recover

attorneys' fees, Plaintiff asks for fees as a sanction in light of Defendants' "totally frivolous

conduct and misrepresentation to this Court as to the current state of the law," ECF No. 103 at 4,

particularly the "misrepresentation" that some or all of the SSN is still required after the SMART

Act.  In support, Plaintiff contends that the SMART Act totally eliminated the requirement of

full or partial SSN disclosure for self-insured entities settling personal injury cases.  Noting that

two Circuits have held that wrongful insistence on SSN disclosure may be so serious that it

might be redressed through a claim brought pursuant to 42 U.S.C. § 1983, Gonzalez v. Vill. of

W. Milwaukee, 671 F.3d  649, 661-73 (7th Cir. 2012); Schwier v. Cox, 340 F.3d 1284, 1292

(11th Cir. 2003),[16] Plaintiff asks the Court to sanction Defendants, presumably based on its

---

[15] Plaintiff also argues that requiring him to provide all or part of his SSN would injure undocumented individuals who may not have an SSN.  ECF No. 103 at 3.  This is a red herring.  There is no suggestion that Plaintiff is undocumented or does not have an SSN.

[16] Other courts have disagreed or excluded state agencies from the scope of such a holding; the tangled case law interpreting the Privacy Act has been exhaustively summarized by the United States Department of Justice in Overview of the Privacy Act of 1974 (2015 ed.), available at https://www.justice.gov/opcl/file/793026/download. The discussion of "Social Security Number Usage" is at 307-12.  Plaintiff confirmed at the hearing that this resource has not been updated since 2015.

inherent power and pursuant to 28 U.S.C. § 1927.[17]  Abdullah v. Evolve Bank & Tr., No. CA 14-131 S, 2015 WL 4603229, at *4 (D.R.I. July 29, 2015).

There can be no doubt that the sanctions of attorneys' fees and costs associated with prosecuting a motion to enforce a court-annexed settlement agreement are appropriate if bad faith or vexatious conduct delayed its consummation.  Id. at *4-5.  In Abdullah, payment of the settlement proceeds was delayed until the brink of the hearing on the motion to enforce.  Id. at *3-4.  Once paid, the motion to enforce was moot, but the plaintiff asked for sanctions in the form of the fees and costs associated with litigating the motion to enforce.  Id. at *4.  In granting the motion for sanctions, the Court examined what the parties had agreed to and held that the conduct causing the delay, considered in light of the agreement, was intentional and egregious in that the defendant not only had deliberately reneged in an attempt to sweeten his deal with another party, but also had acted intentionally based on his desire for revenge on the attorney representing plaintiff.  Id. at *5-6.

Guided by Abdullah, the Court must consider what the Settlement Agreement required of Plaintiff and of Defendants, in light of the undisputed reality that neither MMSEA compliance nor the disclosure of Plaintiff's SSN was discussed.[18]  This analysis rests on traditional principles of contract interpretation under Rhode Island law.[19]

The starting point is the bedrock principle that "[s]ettlement agreements are treated as contracts and enforced under the rules governing contracts generally."  T.G. Plastics Trading Co.

---

[17] Plaintiff does not specify what is the basis for his request for sanctions.

[18] When, as here, the facts are undisputed, the interpretation of contract language is a matter of law to be decided by the Court.  In re Newport Plaza Assocs., 985 F.2d 640, 644-45 (1st Cir. 1993).

[19] One exception is applicable – a court-annexed settlement of an underlying action brought pursuant to a federal statute has no applicable federal statute of frauds; therefore, no writing is required for the settlement to be enforceable.  Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 14 (1st Cir. 2001); Abdullah, 2015 WL 4603229, at *6 n.7.

Inc. v. Toray Plastics (Am.), Inc., 958 F. Supp. 2d 315, 321-22 (D.R.I. 2013).  The content of the

agreement must be interpreted in light of the well settled principle that every contract includes an

"implied covenant of good faith and fair dealing between parties . . . so that the contractual

objectives may be achieved.'" Id. at 326.  That is, "a party's actions must be viewed against the

backdrop of contractual objectives in order to determine whether those actions were done in

good faith." Hord Corp. v. Polymer Research Corp. of Am., 275 F. Supp. 2d 229, 238 (D.R.I.

2003).  The implied covenant requires the parties to be honest in their dealings with each other

and "not purposefully injure" the right of the other "to obtain the benefit of the contract."

FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009).  It is a counterpromise

implied in every contract that the promisee will act in a manner consistent with the purposes of

the contract and will refrain from arbitrary or unreasonable actions at odds with those purposes.

Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d 317, 329-30 (D.R.I. 1999), aff'd,

217 F.3d 8 (1st Cir. 2000).  But if particular actions or inactions were contemplated by the

parties when the contract was formed, activity or inactivity consistent with the express agreement

does not breach the covenant of good faith and fair dealing.  Lifespan/Physicians Prof'l Servs.

Org., Inc. v. Combined Ins. Co. of Am., 345 F. Supp. 2d 214, 225 (D.R.I. 2004).

    Also implied in every contract is the fundamental rule that all contracts are made subject

to any law prescribing their effect or conditions to be observed in their performance.  Citizens for

Pres. of Waterman Lake v. Davis, 420 A.2d 53, 57-58 (R.I. 1980).  "The statute is as much a part

of the contract as if the statute had been actually written into the contract." Sterling Eng'g &

Const. Co. v. Town of Burrillville Hous. Auth., 279 A.2d 445, 447 (R.I. 1971).  Here, the

statutes arguably setting the conditions to be observed and, therefore, to be interpreted as "part of

the contract" in connection with the parties' performance of the Settlement Agreement are

MMSEA (as Defendants argue) and the Privacy Act (as Plaintiff contends).

As applicable here, § 7(a)(1) of the Privacy Act provides in pertinent part that:

> It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

5 U.S.C. § 552a(a)(1).  However, federal law is otherwise clear that disclosure of one's SSN

does not transgress any constitutional right and may be required for various purposes.  E.g.,

Kansas v. Garcia, 140 S. Ct. 791, 797-98 (2020) ("[E]very employee must provide certain

personal information[, including] . . . [SSN].").  Consistent with this proposition, § 7(a)(2) of the

Privacy Act is succinct: "the provisions of paragraph (1) of this subsection shall not apply with

respect to – (A) any disclosure which is required by Federal statute."  5 U.S.C. § 552a(a)(2).  In

the aftermath of the SMART Act, as most recently confirmed by the Proposed Rule, MMSEA

requires a self-insured entity like the State to query CMS using specified information to

determine whether an individual like Plaintiff is a Medicare beneficiary.  42 U.S.C. §

1395y(b)(8)(A)(i).  After the SMART Act, as modified by CMS in the 2014 CMS Alerts, the

specified information that is now "required by Federal statute," 5 U.S.C. § 552a(a)(2), is the full

SSN, but if that is not available, at least the final five digits of the SSN.  Therefore, consistent

with Citizens for Pres. of Waterman Lake, 420 A.2d at 57-58, and Sterling Eng'g & Const. Co.,

279 A.2d at 447, the Settlement Agreement must be interpreted as incorporating and subject to

the MMSEA requirement of disclosure of the SSN (and, if that is not available, at least the last

five digits of the SSN).  It is not subject to the Privacy Act prohibition on SSN disclosure – the

Privacy Act is not applicable because MMSEA is a "Federal statute" requiring preferably full,

but at least partial, SSN disclosure.

With the legal background sketched in, I return to the Settlement Agreement.  To support the proposition that the Court should interpret his silence regarding his intent to refuse to provide his SSN (or part of it) as an affirmative contractual prohibition barring the State from asking for it or conditioning payment of the Settlement Proceeds on the receipt of it, Plaintiff makes what boils down to two arguments.

First, Plaintiff contends that the State should have accepted his sworn statement that he was not a Medicare beneficiary; that, given his claimed age of sixty or sixty-one, he is too young to be a Medicare beneficiary; and that he produced a document from the hospital purportedly showing that he paid out of pocket for any hospital health services he received.  With the troubling inconsistencies of record about what health services Plaintiff really received and what his age really is (all inconsistencies that are squarely the fault of Plaintiff), coupled with the reality that Plaintiff's claimed age was on the cusp of Medicare-eligibility, this argument borders on frivolous.  More fundamentally, it is an argument that has been soundly rejected in every case that has considered it, even in circumstances where it had some appeal because the claimant was extremely unlikely to be a Medicare beneficiary.  See, e.g., In re Asbestos Prod. Liab. Litig., 2013 WL 2367790, at *2-4 (federal law required self-insurers to provide detailed information regarding all liability settlements); Bey, 2013 WL 439090, at *1 (collection of SSN is a "'required, legitimate and necessary use of the SSN under federal law,' . . . 'even where a plaintiff has a reasonable argument that he would not qualify for such benefits'"); Hackley, 2010 WL 3025597, *3-4 (appropriate for insurer to ask for SSN for sixteen-year-old plaintiff and his uninjured father to comply with § 1395y(b)(7) and (8)).  As these cases emphasize, the State should not be "at the mercy" of Plaintiff's untested averment that he was not a Medicare beneficiary.  Hackley, 2010 WL 3025597, *4.

Second, Plaintiff argues that the lack of an overt agreement between the parties means that he was not contractually obliged to act consistently with the State's goal of achieving finality by complying with MMSEA (and avoiding the fines imposed for non-compliance), but rather that he was free arbitrarily to refuse.[20]  This argument flies in the face of the principle that issues and concerns not discussed at the settlement conference and not brought to the attention of the court-annexed mediator or the other side are not part of the settlement.  Gain, 2010 WL 677459, at *2.  More fundamentally, the argument ignores the implied covenant of good faith and fair dealing that inheres in the Settlement Agreement, which required Plaintiff to act in good faith to advance Defendants' purpose of closing the book on any further exposure to the issues raised by the case (including fines imposed by CMS for MMSEA non-compliance).  Baccarat, Inc., 66 F. Supp. 2d at 329-30.  It also ignores that the Settlement Agreement must be interpreted as subject to the State's duty to comply with MMSEA.  Citizens for Pres. of Waterman Lake, 420 A.2d at 57-58.  By entering into a Settlement Agreement that did not explicitly contemplate that he could refuse to disclose his SSN or any part of it, Lifespan/Physicians Prof'l Servs. Org., Inc., 345 F. Supp. 2d at 225, Plaintiff undertook to act in good faith, and not arbitrarily, in light of the goals of the Settlement Agreement, and to avoid purposeful actions to injure the rights of Defendants to obtain the benefit of closure and finality for which they bargained.  FAMM Steel, Inc., 571 F.3d at 100.  That means that Plaintiff was contractually obliged to provide Defendants with as much of the specified information as the State reasonably needed to make a CMS query about his Medicare status; his refusal to disclose at least the fifth from the last digit of his SSN is a breach of the implied covenant of good faith and fair dealing.

---

[20] If the Privacy Act were applicable, it would provide a reason for Plaintiff's refusal to disclose his SSN and his conduct would not be arbitrary.  However, the Privacy Act is not applicable.  Therefore, the arbitrariness of Plaintiff's refusal is well established by his adamant refusal to give a reason why he would not provide his SSN or any part of it.

That this unstated contractual duty was integral to the parties' Settlement Agreement is confirmed by Plaintiff's conduct, both during and after the mediation. For example, Plaintiff expressly acknowledged his contractual duty to address Medicare issues in the Release. He made no objection when Defendants asked him to fill in the RI Medicare Reporting Form as a prerequisite to issuing the check for the Settlement Proceeds. He continued to be silent, permitting the inference of acquiescence, when Defendants reported to the court-annexed mediator that "the State requires [the complete Medicare Reporting Form] before it can process any settlement check." Ex. A, ECF No. 104-1 at 1. Perhaps most damning to the position he is taking now are the statements made by his attorney in the off-the-record conference with the Court, based on which the Court understood that Plaintiff had agreed to provide the State what it needed for MMSEA compliance.

In light of the foregoing, Plaintiff's motion for sanctions is denied. Defendants' conduct has been impeccable, fully consistent with the express and implied terms of the Settlement Agreement; they have done nothing even approaching the vexatiousness and bad faith required for sanctions to be seriously considered. See Abdullah, 2015 WL 4603229, at *4-5. Further, they have been put to extreme expense as a result of Plaintiff's refusal to disclose any part of his SSN, in breach of his implied duty of good faith and fair dealing.[21]

## IV.    CONCLUSION

---

[21] Should the State consider an action against Plaintiff for the injury it has suffered as a result of this breach, the Court cautions that Plaintiff may be able to establish that the breach – arbitrarily refusing to supply any part of his SSN – was conduct that he undertook without malice because he was confused by what the Court can confirm is an extremely confusing set of federal enactments – MMSEA, the SMART Act and the Privacy Act, together with their regulatory progeny. Further, it was the Court, faced by the same bewildering legal landscape and unaware of the extraordinary effort that would be required, that directed the State to take the unnecessary (but for Plaintiff's breach) and burdensome steps to comply with MMSEA by performing 110 queries using the information found in the discovery materials.

Based on the foregoing, Plaintiff's motion (ECF No. 100) is granted to the extent that it asks the Court to enforce the Settlement Agreement in that, the State having complied with the requirements of MMSEA despite Plaintiff's breach of the implied covenant of good faith and fair dealing, Defendants are now obliged to pay the Settlement Proceeds.  The balance of the relief sought by Plaintiff's motion is denied.  Defendants' motion (ECF No. 102) to compel is denied as moot in that the Court's resolution of Plaintiff's motion renders it unnecessary for the Court to determine whether Plaintiff is in breach of an assented-to Order agreed to during an off-the-record conference with the Court.

So ordered.

ENTER:

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
April 27, 2020